This Opinion Is a Precedent
of the TTAB

Hearing:
February 24, 2016

Mailed:
June 30, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Loggerhead Tools, LLC*

————

Serial No. 85700986

————

John E. Munro of Vedder Price PC,[1]
    for Loggerhead Tools, LLC.


Barney L. Charlon, Trademark Examining Attorney, Law Office 104,
    Dayna Browne, Managing Attorney.

————

Before Ritchie, Gorowitz, and Hightower, Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

Loggerhead Tools, LLC has filed an application to register the mark

shown below for "hand tools, namely, gripping tools in the nature of wrenches

---

[1] Different counsel made appearances at the oral hearing, Sarah E. Spires of Skiermont Derby LLP, for Applicant, and Supervisory Senior Attorney Lydia Belzer, on behalf of the Office.

and wire crimpers for sale through mass merchandisers to retail consumers,"

in International Class 8:[2]



The application contains a description of the mark as follows:

> The mark consists of a motion mark depicting the product configuration of a hand tool in which six rectangular-shaped jaw-like elements of the circular head of a hand tool radially move in and out. The elements symmetrically converge and diverge in a mechanical iris-type motion. The broken or dotted lines are not part of the mark and serve only to show the position or placement of the moving elements of the mark in the hand tool.

The Trademark Examining Attorney has refused registration of the applied-for mark under Section 2(e)(5) of the Trademark Act of 1946, 15 U.S.C. § 1052(e)(5), on the ground that Applicant's proposed mark is functional and thus unregisterable. When the refusal was made final,[3]

---

[2] The application was filed on August 10, 2012, pursuant to Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming March 2005 as the date of first use and June 2005 as the date of first use in commerce. The application asserts acquired distinctiveness under Section 2(f) of the Trademark Act.
[3] The application was initially refused on additional grounds which were withdrawn with the final office action issued on October 26, 2014.

Applicant appealed and requested reconsideration. After the request for reconsideration was denied, the appeal was resumed. Both parties filed briefs, and Applicant filed a reply brief. Applicant requested an oral hearing, which was presided over by this panel. For the reasons discussed below, we affirm the functionality refusal.

<u>2(e)(5) Functionality</u>

The Supreme Court has explained that a product feature is functional, and cannot serve as a trademark, if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices Inc. v. Marketing Displays Inc.,* 532 US 23, 58 USPQ2d 1001, 1006 (2001) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982)). Functional matter cannot receive trademark protection. At its core, the functionality doctrine serves as a balance between trademark and patent law, as noted by the Supreme Court in *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995):

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

In determining the possible functionality of a proposed mark, we consider the following four factors as set forth by our primary reviewing court, the Court of Appeals for the Federal Circuit:

> (1) the existence of a utility patent that discloses the utilitarian advantages of the design sought to be registered;
>
> (2) advertising by the applicant that touts the utilitarian advantages of the design;
>
> (3) facts pertaining to the availability of alternative designs; and
>
> (4) facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture.

*In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982).

Although *Morton-Norwich* was decided prior to the Supreme Court cases of *Inwood, Qualitex,* and *TrafFix,* the Court of Appeals for the Federal Circuit has since determined that the four factors continue to be availing in a functionality analysis. *See Valu Eng'g Inc. v. Rexnord Corp.,* 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002) ("We do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton-Norwich* analysis.").

<u>Utility Patent</u>

Applicant is the owner by assignment of United States Patent No. 6,889,579, entitled "Adjustable Gripping Tool." One embodiment includes "six gripping elements" as shown in figure one of the patent:

4



U.S. Patent   Aug. 9, 2011   Sheet 1 of 24   US 7,992,470 B2

EXHIBIT B

*FIG. 1*

In the background of the invention, the utility patent includes the following

description of the tool's motion:

> the gripping tool of the present invention symmetrically translates
> the force applied to the gripping tool onto the workpiece in a
> symmetrically balanced and mechanically advantaged and efficient
> way.

As indicated by the Supreme Court, "A utility patent is strong evidence that

the features therein claimed are functional." *TrafFix,* 532 U.S. at 29.

Applicant, however, argues that the motion for which it seeks registration

herein is not claimed in the utility patent. Precedent nevertheless dictates that the relevant language need not be in the claims themselves. "Indeed, *TrafFix* teaches that statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality." *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012).

We find Applicant's description of the invention in the utility patent, taken together with the drawings therein, to be on point with the relevant portion of the description and drawing of the tool in the present application for this product configuration motion mark.[4] The patent thus is strong evidence that the matter is functional. *See TrafFix,* 58 USPQ2d at 1005; *Becton*, 102 USPQ2d at 1377.

Applicant argues that its design is actually the subject of a design patent, United States Patent No. D618,974, entitled "Hydrant Tool." The design patent contains one claim, which states "The ornamental design for a hydrant tool, as shown and described." The drawings in the design patent display only five gripping elements:

---

[4] We note that both Applicant and the Examining Attorney have characterized the mark in their briefs (and in Applicant's reply brief) as "product design." *See, e.g.*, 13 TTABVUE 5; 15 TTABVEUE 7; 16 TTABVUE 18.




Applicant argues that its design patent is persuasive evidence of the non-functionality of the overall design. However, the facts of this case are analogous to those discussed by the Court of Appeals for the Federal Circuit in *Becton*. There, the Court found that, although the applicant had a design patent, "the fact that a device is or was the subject of a design patent does not, without more, bestow upon said device the aura of distinctiveness or recognition as a trademark." *Id.* at 1377 (quoting *In re R.M. Smith, Inc.,* 734 F.2d 1482, 1485 [222 USPQ 1] (Fed. Cir. 1984)). The *Becton* court further observed that the design patent in that case did not reflect the specific design for which trademark protection was sought, thus noting:

> Our law recognizes that the existence of a design patent for the very design for which trademark protection is sought 'presumptively . . . indicates that the design is *not de jure* functional.' *Morton Norwich,* 671 F.2d at 1342 n.3. Absent identity between the design patent and proposed mark, the

> presumption loses force, and the 'similar' design patents lack sufficient evidentiary value to overcome the strong conclusion in this case that [applicant's] utility patents underscore the functionality of significant elements of the proposed mark.

*Becton,* 102 USPQ2d at 1377. Likewise, here, we find that Applicant's design patent does not cover the motion described in the application. Specifically, unlike the utility patent, the design patent depicts a figure with only five gripping elements, not six, and does not anywhere describe the motion of the tool. Since the design patent, unlike the utility patent, is not on point, we find it unavailing, and we follow the reasoning of the Federal Circuit in *Becton* in finding that the non-identical design patent fails to overcome the "strong conclusion" that the disclosure of the utilitarian advantages in the utility patent indicates functionality. *Id.*

Advertising Touting Utilitarian Advantages

With this second *Morton-Norwich* factor, we consider evidence regarding "advertising materials in which the originator of the design touts the design's utilitarian advantages." *Valu Eng'g v. Rexnord Corp.,* 61 USPQ2d at 1426 (citing *Morton Norwich*); *see also In re Heatcon, Inc.,* 116 USPQ2d 1366, 1373 (TTAB 2015). The Examining Attorney points to numerous instances where Applicant touts its patented motion feature as a utilitarian advantage of its tool. Specifically, Applicant touts the symmetrical movement of the six gripping elements in its product configuration as providing the benefit of an

equal distribution of force on the work object, with less strain on the corners of the nut or bolt.

Some examples include the following:[5]

> According to LoggerHead Tools, . . . [t]hese tools combine the functionality of an adjustable wrench and pliers to automatically size and grip fasteners.
> Professional Tools & Equipment News; May 2006.
> Attached to January 23, 2013 Response to Office Action, p.123.

> This wrench automatically sizes and grips a wide range of nuts and bolts distributing equal force on all sides of a fastener.
> Colorado Country Life; June 2006.
> Attached to January 23, 2013 Response to Office Action, p. 125.

> When the ergomonic handle is squeezed, six steel jaws simultaneously converge on the sides of the nut or bolt for a tight fit that reportedly will not slip or round off the edges.
> FMC; August 2006.
> Attached to January 23, 2013 Response to Office Action, p. 129.

> With a one-handed squeeze the Bionic Wrench automatically sizes and grips the U.S and metric sized nuts and bolts, distributing equal force on all sides.
> Land Line; July 2005.

---

[5] Applicant submitted hundreds of pages of advertisements and media references into the record. On many of these, Applicant highlighted by hand certain key points in the document. When scanned, as the documents are, the added shading makes it quite challenging to view the wording beneath the highlighting. The better practice would be to refer to the cited quotes in the response by exhibit and page number and to submit as clear a copy as possible. Filers are responsible for ensuring that all submissions are legible. *See* Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 110.09(c)(2) (June 2015) (ESTTA filings). PDF files created from scanned documents are typically lower in quality than those generated directly from word processing files, webpages, or other digital content. In cases where scanning cannot be avoided, filers are urged to inspect the resulting PDF file for quality prior to filing. After scanning, annotations such as highlighting can be added with some PDF software. Doing so usually produces better results than highlighting by hand prior to scanning.

Attached to January 23, 2013 Response to Office Action, p. 140.

With one hand squeeze, the 8-in. wrench automatically sizes and grips nuts and bolts and distributes equal force on all sides of the work, eliminating the need to search for an exact size wrench.
MOTOR; August 2005.
Attached to January 23, 2013 Response to Office Action, p. 142.

The Bionic Wrench *As Seen On TV!* The Bionic Wrench is a remarkable patented hybrid of an adjustable wrench with the ease of use of a pair of pliers. In addition, the genius of attaching a bolt/nut on all 6 flat sides removes the stress and strain on the corners of the bolt.
*Coastaltool.com*; July 25, 2012.
Attached to January 23, 2013 Response to Office Action, p. 167.

Bionic Wrench offers 'mechanical advantage':
The hybrid tool delivers a mechanical advantage because it equally distributes force around the workload, the company said in a news release.
The Trucker; August 31, 2005.
Attached to January 23, 2013 Response to Office Action, p. 170.

Herrington Customer Patents Breakthrough Bionic Wrench-Gives You a 6 Million Dollar Arm!: Dan Brown's been a loyal customer for years, so I was flattered when he asked us to help introduce his latest invention. Dan already holds 25 U.S. patents – so he's a proven innovator. But Bionic wrench may be his best ever – receiving the prestigious Editor's Choice Award from the hard-to-impress folks at <u>Popular Mechanics</u>. Combining the best features of an adjustable wrench with the simplicity of pliers, Bionic Wrench *automatically* grips the most common sizes of U.S. and metric nuts and bolts. . . Better yet, you gain a mechanical advantage unlike any other hand tool.
Herrington; [undated].
Attached to January 23, 2013 Response to Office Action, p. 208.

This evidence also strongly supports a finding that Applicant's applied-for mark is functional.

Availability of Alternative Designs

Because the first two factors show that Applicant's design is functional (*i.e.*, it affects the . . . quality of the article"), we need not address whether other designs exist or are hypothetically feasible. *See TrafFix*, 58 USPQ2d at 1005; *Becton*, 102 USPQ2d at 1378 (where "the patent and advertising evidence established functionality, the Board did not need to analyze whether alternative designs exist"). Nevertheless, in an interest in completeness (should Applicant seek judicial review of our decision), we address Applicant's argument that "there are many alternative designs already in existence in the marketplace competing in the adjustable wrench product category." Applicant's Appeal Brief, 13 TTABVUE 19. To support this argument, Applicant submitted declarations from Dr. James Edward Colgate and Mr. Tong Jin Kim, both dated April 23, 2015. Both appear to be qualified as experts in the field of industrial design, which was not disputed by the Examining Attorney.[6] Referring to alternative designs, Dr. Colgate commented that the applied-for mark "depicts one alternative among many

---

[6] Both experts offered the legal conclusion: "In my opinion, the Applied-for Mark does not depict a functional product design." Colgate, para. 7, at April 27, 2015 Request for Reconsideration p.16; and Kim para 7, at April 27, 2015 Request for Reconsideration p. 50. However, neither appears to be qualified as an expert in the field of trademark registration, and we give no weight to those legal conclusions. *Cf. Edwards Lifesciences Corp. v. VigiLanz Corp.,* 94 USPQ2d 1399, 1401 (TTAB 2010) ("[T]he Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.") (citing *Fisons Ltd. v. UAD Laboratories, Inc.,* 219 USPQ 661, 663 (TTAB 1983) ("The opinions of witnesses, even expert witnesses, on the question of likelihood of confusion "are entitled to little if any weight and should not be substituted for the opinion of the tribunal charged with the responsibility for the ultimate opinion on the question." (citations omitted)).

possible alternatives for a tool that provides an adjustment feature so that the tool can be used with more than one size of fastener." Colgate decl., at para 8, April 27, 2015 Request for Reconsideration p. 16, 8 TTABVUE 23. Dr. Colgate further stated that "Such alternative designs could provide similar benefits of adjustability and distribution of forces but they exhibit very different aesthetic appearances." *Id.* at para. 9. He referred to Exhibit 1 to his declaration, 8 TTABVUE 25-27:



Examples of "Adjustable Wrenches"
Exhibit 1

## Examples of "Adjustable Wrenches"
### Exhibit 1

[Type here]

[Type here]

| | | | |
|---|---|---|---|
| Skill Speed Slide Adjustable Wrench | | | http://toolguyd.com/skil-speed-slide-wrench/ |
| Total Socket Box End Adjustable Wrench | | | http://toolguyd.com/page/10/?s=adjustable |
| ASD Adjustable Sockets | | | https://www.youtube.com/watch?v=tbalHPUJYEQ |
| Gedore Grip Adjustable Wrench | | | http://toolguyd.com/gedore-grip-wrench-locking-pliers-with-hex-jaws/ |
| Ridgid Adjustable Barrel Wrench | | | https://www.protoolreviews.com/?s=rigid+barrel |
| Adjustable Converging Jaws | | | |
| | | | |
| | | | |

3

## Examples of "Adjustable Wrenches"
## Exhibit 1

[Type here]                                                                                    [Type here]

| | | | | |
|---|---|---|---|---|
| Crescent Adjustable Wrench | | | | https://www.youtube.com/watch?v=tl6sm24HHis |
| Kobalt™ Dial To Fit Adjustable Wrench | | | | http://www.ebay.com/itm/NEW-KOBALT-DIAL-TO-FIT-RACTHET-WRENCH-UNIVERSAL-SAE-MM-ADJUST-NO-SOCKETS-NEEDED-/121352286921?pt=LH_DefaultDomain_0&hash=item1c4128f2c9 |
| Adjustable Ratcheting Wrench | | | | https://www.youtube.com/watch?v=hv5gdila8Dw |
| Craftsman Adjustable Sockets | | | | http://toolguyd.com/craftsman-extreme-grip-socket-set/ |
| Adjustable Clench Wrench | | | | http://toolguyd.com/crescent-folding-ratcheting-wrench-set/ |
| Sealey Adjustable Clench Wrench | | | | http://www.kltoolsaustralia.com/sealey/sealey-ak9465-adjustable-clench-wrench-10-30mm-p5480.html |
| Skill Secure Grip Adjustable Wrench | | | | http://toolguyd.com/skil-secure-grip-wrench-set/ |
| Hydrokinetic Adjustable Wrench | | | | http://toolguyd.com/page/2/?s=adjustable+wrench |

2

Mr. Kim, whose declaration incorporated and referred to the same Exhibit 1, similarly stated that "there are many ways to adjustably grip and turn a fastener. . . . [A]ll of these designs share a common function of engaging a fastener and transmitting a rotational force." Kim decl., at para 8, April 27, 2015 Request for Reconsideration p. 50, 8 TTABVUE 57. He further stated that "aesthetic design choices" made by Applicant include "the size and shape of the jaws relative to the size and shape of the head of the tool coupled with their resulting movements of the jaws." *Id.* at para. 9.

Applicant's reply brief refers to "overwhelming evidence" of alternative designs evidenced in Exhibit 1 to the Colgate and Kim declarations, showing "moving jaw-like elements and other adjustable wrenches." 16 TTABVUE 15-16. We understand the expert declarations to be referring to the general motion of adjustability and not to adjustability achieved by virtue of the simultaneous convergence or iris-like motion discussed in the utility patent or described in the application for trademark registration. While there are numerous examples of adjustable wrenches, there are only a few examples in the record that appear to move in an "iris-type motion" as described in the application. Applicant's own evidence indicates that its design sets it apart as one of the best, thereby hampering or even eliminating competition in this regard. *See In re Bose,* 772 F.2d 866, 227 USPQ 1, 6 (Fed. Cir. 1985) ("If the feature asserted to give a product distinctiveness is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is

hindered. *Morton-Norwich* does not rest on total elimination of competition in the goods.") Accordingly, even if evidence of alternative designs were relevant in this case (*i.e.*, if the utility patent or advertising did not demonstrate that the design is functional) we do not find Applicant's evidence persuasive.

Cost of Manufacturing

A product feature is functional "if it affects the cost *or* quality of the article." *TrafFix*, 532 U.S. at 32 (citations omitted; emphasis added). Because we have found that the feature is functional because it affects the *quality* of the wrench, we need not also determine if it is independently functional because it affects the *cost* of the wrench. In the interest of completeness, however, we address Applicant's evidence that its chosen design is not comparatively simple and inexpensive to manufacture. Applicant submitted the declaration of Dan Brown, its founder and president,[7] dated January 23, 2013. Mr. Brown states that "[t]he choice of the shape and configuration of the jaw-like element was made for its appearance among various alternatives." Brown decl., para 7, January 23, 2013 Response to Office Action, p. 258. He further added that it was "not the most cost-effective combination among the various alternatives available." *Id.* at para. 8. Even if this design were expensive to make, that would not negate our finding (based on Applicant's patent and advertising) that the design positively affects the *quality* of the article. In addition, this conclusory statement does not preclude

---

[7] Mr. Brown is the inventor on the utility and design patents, assigned to Applicant.

the possibility that Applicant's design is otherwise cost effective. *See Becton,* 102 USPQ2d at 1378 (where the only evidence of the fourth factor constituted declarations from applicant, the Board did not err in refusing to weigh them). We find Applicant's evidence unpersuasive with regard to this factor.

Summary of Functionality Findings

In considering the *Morton-Norwich* factors, we note again that a utility patent is strong evidence of functionality. Applicant's utility patent describes "the gripping motion" that "symmetrically translates the force applied to the gripping tool onto the workpiece in a symmetrically balanced and mechanically advantaged and efficient way." We find that this describes the iris-type motion that Applicant seeks to register with its product configuration trademark application. Applicant's design patent, on the other hand, does not describe the iris-type motion, and thus does not counter our finding. The strong evidence of functionality from the utility patent is further supported by advertisements touting the utilitarian aspects of the motion. We find based on the utility patent and advertising that the design is functional in a utilitarian sense. As a consequence, Applicant's evidence of alternative designs and comparative cost of manufacture is unavailing. *See Becton,* 102 USPQ2d at 1378 ("[I]f functionality is found based on other considerations, there is 'no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available.' *Valu Eng'g* 278 F.3d at 1276.").

Applicant's Other Arguments

Applicant argues that we must weigh all the elements of the applied-for mark in our determination of functionality.

> Some of these elements include the size of the jaw-like elements, the shape of the jaw-like elements, the relative size and orientation of the jaw-like elements, the shape of the opening, the relative size of the opening, the exposure of the jaw-like elements so that a consumer can see the movement of the jaw-like elements, among others.

Reply Brief, 16 TTABVUE 6.

Applicant notes that some of these features, such as the visibility of the jaws, are "nonfunctional aesthetic design choices made by Appellant during the creation of its product." *Id.* at 10. The Court of Appeals for the Federal Circuit has advised that it is appropriate to weigh the elements of a mark in determining its overall functionality. *See Becton,* 102 USPQ2d at 1376 (citing *Morton Norwich*). That court has also cautioned, however, that we must reach our ultimate conclusion based on the applied-for mark as a whole. *Id.* In doing so, we are mindful of the statements made by the Supreme Court:

> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of a product, . . . the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

*TrafFix,* 532 U.S. at 34. In considering all of the matter in Applicant's applied-for mark, we do not find that the non-functional elements, such as the visibility of the motion and other aesthetic aspects of the jaws, serve to outweigh the overall functionality. In reaching this conclusion, we note that

in analyzing Applicant's product configuration motion mark, the analysis is the same as it would be for any other product configuration, product design trade dress or other non-traditional mark such as color or sound. *See* Trademark Manual of Examining Procedure ("TMEP") § 1202.02(a)(viii)) (April 2016) and case law discussed therein.

Applicant has also referred to two registered motion marks. Registration No. 1,946,170 is owned by Yamaha Hatsudoki Kabushiki Kaisha for "jet propelled water vehicles," in International Class 12, claiming acquired distinctiveness in the following mark:



The registration contains the following description:

> The mark is comprised of a three dimensional spray of water issuing from the rear of a jet propelled watercraft and is generated during the operation of the watercraft

Registration No. 2,793,439 is owned by Automobili Lamborghini S.P.A., for "automobiles," in International Class 12, claiming acquired distinctiveness in the following mark:



It contains the following description:

> The mark consists of the unique motion in which the door of a vehicle is opened. The doors move parallel to the body of the vehicle but are gradually raised above the vehicle to a parallel position.

Applicant argues that these motion marks were registered despite serving a functional purpose. Although referencing the registrations in its August 15, 2013 Response to Office Action, Applicant did not include copies of the two registrations or the files thereof in the record. There is no indication that any of the *Morton-Norwich* factors were at issue in the prosecution of either application, including the presence of utility patents or advertising touting the utilitarian advantages of the motion, as is the case here. Even if this record included that evidence, it would not help applicant. The USPTO must examine each application on its own merits based on the record in the application under consideration and neither the USPTO's examining attorneys nor the Board are bound by the decisions of other examining attorneys in other applications. *See In re Cordua Restaurants, Inc.*, --F.3d--, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine

all trademark applications for compliance with each and every eligibility requirement . . . ."); *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009) ("Even if all of the third-party registrations should have been refused registration . . . , such errors do not bind the USPTO to improperly register Applicant's marks.") (citation omitted); *In re Nett Designs, Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court."). Accordingly, these registrations are unavailing in our analysis.

Applicant next points to two nonprecedential Board decisions in which functionality refusals were reversed, arguing that the facts are analogous to those herein. The cases are *In re Lin,* Application Serial No. 85065887 (TTAB December 14, 2012) (reversing functionality refusal on "exercise and toy hoop"), and *In re Hershey,* Application Serial No. 77809223 (TTAB December 8, 2011) (reversing functionality refusal on product configuration of Hershey's candy bar). The facts are not analogous, however, since in neither case was a utility patent of record.[8]

---

[8] While applicants may cite to non-precedential decisions, such decisions are not binding on the Board and the Board does not encourage this practice. *In re Fiat Grp. Mktg. & Corporate Commc'ns S.p.A.*, 109 USPQ2d 1593, 1596 n.6 (TTAB 2014); *In re Procter & Gamble Co.,* 105 USPQ2d 1119, 1121 (TTAB 2012); *In re Luxuria s.r.o.,* 100 USPQ2d 1146, 1151 n.7 (TTAB 2011); *Corporacion Habanos SA v. Rodriquez*, 99 USPQ2d 1873, 1875 n.5 (TTAB 2011).

Finally, Applicant argues that its design is distinctive and has been the subject of numerous awards. We note that the application is subject to a claim of acquired distinctiveness. Nevertheless, the Trademark Act (also known as the Lanham Act) specifically excludes material refused under Section 2(e)(5) from Section 2(f) claims of acquired distinctiveness. 15 U.S.C. § 1052(f) ("Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce."); *see also TrafFix,* 58 USPQ2d at 1007 ("The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.").

When considering the proposed product configuration motion mark as a whole, we find that the *Morton-Norwich* factors indicate that it is functional. Applicant's utility patent and the abundance of its advertisements touting the utilitarian advantages offered by the identified motion highlight that the product feature[s] Applicant seeks to register "affect[ ] the . . . quality of the article." *See TrafFix,* 58 USPQ2d at 1006. It therefore cannot be registered.

**Decision:** The refusal to register is affirmed.